Cantwell v. Johnson.

HARRY J. CANTWELL, Plaintiff in Error, v. JAMES BROOKS JOHNSON.

**Division One, July 12, 1911.**

1. EQUITY: Lawyer and Money-lender.   In equity lawyer and money-lender, borrower and lender, meet upon a dead level.

2. ————: Evidence: Remote and Extraneous Matters.   Evidence tending to show that plaintiff and defendant, during a long business acquaintance, had many joint transactions in mining enterprises, in which defendant carried plaintiff for large sums and exacted usurious interest under cloak of commissions and brokerage, is not germane to the subject-matter of a suit to enjoin execution of a judgment based on a note secured by a pledge of mining stock, and is not competent.

3. ————: ————: Indorsement of Note: For Consideration: For More Than Year.   An oral agreement to indorse the original and renewal note of plaintiff at the bank, at $50 per indorsement, until plaintiff was put in position to pay the same by realizing on his collaterals, is not one to be performed within a year, and therefore would not support an action under the Statute of Frauds, and hence is not competent proof to show that the indorser fraudulently permitted the bank to foreclose its lien on the collaterals, or that the indorser after having paid the note fraudulently took judgment thereon.

4. ———: ———: ———: ———: No Attempt or Ability to Perform. But even if the Statute of Frauds did not apply, yet as there was no proof that the bank was willing to accept the indorser's new indorsement, none that the plaintiff had other collaterals on which to realize or made any reasonable attempt to fulfill his part of the agreement "by realizing on his other collaterals," and none that he made any attempt to avert his injury by securing another indorser, or tried to place his loan elsewhere, there was no error in excluding that testimony.

5. PROMISSORY NOTE: Collateral: Purchase By Indorser. The indorser of a note, secured by a pledge of stock, has the right, when the note becomes due and the stocks are sold under the pledge, to buy them, have the amount paid therefor credited on the note, pay the balance, and claim the stock as his own, and thereafter to sue for the balance so paid, and he does not commit any fraud in so doing.

6. FRAUD: Setting Aside Former Judgment at Law: Res Adjudicata. Where a plaintiff once had his day in court and could have set up as a defense the fraud he now claims shows the judgment therein should be set aside, the matter becomes res adjudicata. When the help of a court of equity is asked to undo what has already been adjudged by a court, fraud in the cause of action itself, in false allegations or false testimony, will not suffice. Plaintiff's own negligence or carelessness or failure to make the defense available to him in the former suit will bar his right to have the judgment therein set aside. Fraud entitling him to relief must be fraud arising on extrinsic matter whereby he or the court was tricked, and the court was made an instrument of injustice. He cannot stand by and know the suit is pending, and make no effort to present his defense, and after judgment has gone against him come into a court of equity and have that judgment set aside on the ground that if he had presented to the court in that case the matters he now sets up in his bill he could have defeated that judgment.

7. ———: ———: ———: Motion for New Trial. Where defendant in the law case filed a general denial and after judgment had gone against him filed a timely motion for a new trial, and therein presented his defenses on the merits and the reasons the trial should have been postponed till those defenses could be made effective by proper pleadings and evidence, and that motion being overruled he voluntarily failed to prosecute his appeal, the matters therein become res adjudicata, and he does not have the right to have that judgment set aside by a court of equity. And he cannot offer as an excuse for not appealing that plaintiff therein did not sue out execution until a year had gone by.

8. **PLEDGE: Option: Redemption: Contract to Repurchase.** An agreement to surrender stock upon condition that plaintiff pay a judgment is not a pledge of the stock, but a conditional sale, an option to repurchase within limits, and not being performed within the time named and no tender being made, plaintiff has no right to redeem. The right to redeem pertains to a mortgage or a pledge. But the purchase of stocks by an indorser of a note secured by a pledge of stocks, at a regular foreclosure sale, does not constitute the purchaser a pledgee; and an agreement to surrender the stocks so bought to the maker of the note upon his payment of the debt, is not a mortgage or a pledge, but a conditional sale.

9. **EXECUTION: Excessive Levy: Injunction.** A levy of execution will not be set aside on the ground that an excessive amount of property was levied upon. The execution debtor has the right to elect the part he wishes sold first, and if the sheriff abuses his discretion he still has a remedy in a timely motion to set aside the sale.

Error to St. Louis City Circuit Court.—*Hon. Matt G. Reynolds,* Judge.

AFFIRMED.

*R. E. Rombauer* for plaintiff in error.

(1) The court tried the case under an erroneous theory as to the issues involved. McDaniels v. Lee, 37 Mo. 204; Woodard v. Mastin, 106 Mo. 324; Reyburn v. Mitchell, 106 Mo. 365; Savings Inst. v. Colonius, 63 Mo. 292; Greenway v. James, 34 Mo. 326; Northup v. Ins. Co., 47 Mo. 443; Musser v. Adler, 86 Mo. 445; Smalley v. Hale, 37 Mo. 102. (2) The decree of the court is against equity. It is against the evidence and weight of the evidence. Reilly v. Cullen, 159 Mo. 322; Chance v. Jennings, 159 Mo. 544; Bresnehan v. Price, 57 Mo. 422; Murphy v. Smith, 86 Mo. 333; Forester v. Moore, 77 Mo. 651; Moore v. Ringo, 82 Mo. 472. (3) The court erred in excluding legal and competent evidence offered by the plaintiff, and in admitting illegal and incompetent evidence

236 Sup.—37.

offered by the defendant. Stewart v. Severance, 43 Mo. 322; Burgert v. Borchert, 59 Mo. 80; Dickson v. Kempinsky, 96 Mo. 252; McClurg v. Trust Co., 137 Mo. 106; Frederick v. Allgaier, 88 Mo. 598; Smalley v. Hale, 37 Mo. 102; Bank v. Donnell, 172 Mo. 384; Storage Co. v. Glasner, 169 Mo. 38.

*John A. Gilliam* for defendant in error.

LAMM, J.—Equity. Suit to enjoin the enforcement of a judgment in favor of defendant and certain executions issued thereon, for an account and for the redemption of certain corporate stock and bonds.

A temporary injunction issued, *nisi,* which was dissolved on final hearing and the bill dismissed. Unsuccessful in his motions for a new trial and in arrest, Cantwell saved his exceptions in a bill settled and allowed, and, on due steps, brings error, giving a *supersedeas* bond by our leave.

THE PLEADINGS:

Summarized, the bill alleges that at a certain time (in 1902) Johnson loaned Cantwell $4000, taking as collateral security 500 shares of stock in the Columbia Lead Company and $3000 of bonds issued by the Topozark Orchard Company, all of a par value of $8000 and of an actual value in excess of the loan. That subsequently, Cantwell paid $800 on the loan, and thereafter (it being due) Johnson, having an eye to the consummation of a fraudulent scheme outlined further on, "falsely" represented to Cantwell that he, Johnson, was in "need of money," and thereby persuaded Cantwell to borrow the money on the same collateral from the National Bank of Commerce, and repay him—promising at the same time that he would indorse Cantwell's note by way of renewal from time to time in the bank until such time

as he was able to struggle out of his financial embarrassment and pay the bank's debt. That such indorsements were to be put upon a paying basis, something for something, a *quid pro quo, viz.,* $50 apiece. That the note was executed to and discounted by said bank for $3200, running for four months. That it bore Johnson's said indorsement (paid for at the agreed price) and was secured by said collaterals. That when the note to the bank became due, Cantwell was still in financial embarrassment, and Johnson, violating his agreement to indorse, fraudulently taking advantage of Cantwell's necessities in order to obtain the collateral deposited with the bank, declined to indorse, though requested to do so by Cantwell, and "fraudulently urged" the bank to foreclose in order that he might buy. That the bank, so urged by Johnson, gave Cantwell notice of foreclosure of the pledge, and in July, 1904, sold the collaterals to Johnson for the grossly inadequate price of $800, though worth at the time more than the bank loan for which they stood pledged, as Johnson well knew. Thereupon, Johnson, responding to his obligation as indorser, paid the bank the amount due on Cantwell's note after the bank credited thereon the proceeds of the sale, and obtained an assignment of the note and collaterals. That, subsequently, in December of that year, Johnson and Cantwell entered into an agreement, in *form* a resale of the collaterals, but in effect in equity a renewal of the pledge of them, whereby Cantwell was given an option in consideration of $200 paid down to repurchase them at any time prior to February 16, 1905. That Johnson failed to credit the $200 on the note, but retained the same as usurious interest, whereby his lien on the collaterals became extinguished by virtue of the statute in that behalf. That said agreement further provided that on payment of a further sum of $500 such option to repurchase might be exercised by Cantwell at any time within four months af-

ter January 15, 1905. That in violation of said promise on February 21, 1905, Johnson sued Cantwell in the St. Louis Circuit Court on said assigned note, his petition "fraudulently asserting" that the amount due was $2569.61 with interest from July 8, 1904. That thereafter Cantwell called Johnson's attention to his inequitable and oppressive conduct, whereupon he agreed for $500 (then paid him by Cantwell) to continue said suit from "time to time," and that (he being amply secured) Cantwell should have the right to redeem the collaterals at any time by paying the residue of the debt with interest. That, subsequently, in October of that year, Cantwell being then in New York on important business preventing his immediate return, said suit was set for trial, and Johnson, taking advantage of Cantwell's absence, wired him he would not continue the suit unless Cantwell paid him a certain amount on the debt, a certain brokerage fee, his attorney's fee and certain taxes paid. That Cantwell submitted to the imposition and paid the money —$651.96—no part of which was credited on the note, but all of which was appropriated by Johnson as usury. That in April, 1906, the cause was again set for trial and Cantwell insisted upon a continuance at the hands of Johnson to which the latter agreed, the day before the trial day. In violation of that agreement, on the next day, April 23, 1906 (the day on which the suit was set down for trial), Johnson notified Cantwell he would not agree to a further continuance but insisted on a trial. That relying on Johnson's agreements and obligations as set out, Cantwell had filed in that suit only a "general denial" and had not set up his many special defenses, shown in the facts heretofore stated, and was wholly unprepared for trial; in that, on the spur of the moment, he could not collect the data to make his special defenses even if the court had permitted him to file his answer. That on the next day, April 24th, in violation of his obligation, and in

the absence of Cantwell, Johnson took a judgment
for $2668.80, being $1200 in excess of the amount due,
"and plaintiff charges that defendant was guilty of
fraud in the procurement of said judgment." Sub-
sequently, in time, Cantwell applied to have that judg-
ment vacated, which application was refused. Subse-
quently, he tendered Johnson in cash $2750—a sum in
excess of all due—and demanded in connection with
the tender a return of the stock and bonds, which
tender Johnson oppressively declined and refused to
deliver the stock and bonds. That subsequently, in
1907, Johnson caused executions to issue on his judg-
ment and caused "grossly excessive, fraudulent and
oppressive" levies to be made that will "wreck" plain-
tiff unless enjoined. It is further alleged that all the
recited acts are fraudulent, oppressive and contrary
to equity and good conscience and that plaintiff has
no adequate remedy at law.

Johnson answered admitting he obtained the
judgment, admitting the executions and the levies,
but denying fraud in the procurement of the judg-
ment, denying the levies were excessive or fraudulent,
denying all other allegations of fraud, etc., and ask-
ing the injunction be dissolved.

So much for the pleadings.

THE TRIAL:

To make his case, plaintiff put Mr. Cowan, assist-
ant cashier of the National Bank of Commerce, on the
stand, and by him proved that plaintiff's note at the
bank, secured by the stocks and bonds mentioned, ma-
tured June 8, 1904, was protested for non-payment
and witness notified defendant, Johnson, as indorser,
to take it up. Johnson "had some conversation with
our president, who thereupon ordered us to sell out
the collaterals." The sale was duly advertised, was
regular in all respects and realized the net amount
of $664.67, credited on the note. Johnson was the
purchaser and the balance, $2559, was paid by him to

the bank. The sale of collaterals was July 8, one month after the dishonor of the note.

The note was in two parts. First, a straight note in ordinary form, bearing interest at 8 per cent from maturity, dated February 5, 1904, and due in four months, for $3200, signed by Cantwell and indorsed across its back: "J. B. Johnson." Second, another part, also signed by Cantwell, evidenced the contract of pledge. It set forth the execution of the note, a desire to secure the same, and pledged to the bank as collateral security said stock and bonds, describing them; and provided that in case of default the bank was authorized to sell the collaterals at public or private sale at the Merchants Exchange or elsewhere, at its option, and apply the proceeds, first, to the expenses of the sale and, next, to the discharge of Cantwell's liability. The final clause runs: "In case of a sale of said collaterals, said bank . . . may become the purchaser thereof without any right of redemption on my part."

Cantwell took the stand in his own behalf, testifying he was a "lawyer and miner" and Johnson was "by profession a money lender."

At the outset an attempt was made to show by him that he had known Johnson for 15 years or so; that their relations were intimate; that they had a large number of "transactions" together; that Johnson was familiar with, and had embarked with witness in a great many of, his mining transactions; that while they were engaged in the same enterprises (or during a great part of that time) Johnson "carried" witness to the extent of $20,000 or more, and witness paid him "commissions and brokerage" exceeding the highest rate allowed by law. These offers were refused and plaintiff saved the point.

Having shown that Johnson indorsed said note, an attempt was made to prove by witness that there was at the outset of the bank loan, an arrangement

between the two by which Johnson was to receive $50 for each indorsement on the successive renewals of the note at the bank until such time as Cantwell was put in position to pay the same by realizing on his other collaterals. This offer was also refused and plaintiff saved the point.

An attempt was then made to show that witness called on Johnson and requested him to renew the note in accordance with the agreement outlined in the former offer. The court, on objection, refused the offer—plaintiff excepting at the time.

Witness then produced and identified the following agreement, signed by him and Johnson, and read into the record:

Dec. 3, 1904.

I hereby agree to resell to H. J. Cantwell the 500 Columbia Lead Company stock and 3M Topozark Orchard Company Bonds pledged for note of Feb. 5, 1904, and sold July 8th for the said note, interest and costs, and interest to date of resale at 8%, and upon payment in full to cancel said note. This option of resale to extend not later than Jan. 15, 1905, Cantwell paying now $200, which shall be applied as part payment, if resale is perfected at or prior to date, otherwise to be a consideration for this option, time being the essence.

It is further agreed that he may exercise this option, by paying $500 additional cash, and executing his note with the securities as collateral for four months from date of resale, with interest from that date at 8% per annum.

Continuing, he testified he paid Johnson $200 at the time of that agreement, "as well as $500 subsequently." He could not say whether the last payment was before or after January 15, 1905. On motion that part of the answer relating to the $500 payment was stricken out—the grounds not appearing and plaintiff saving the point. [Note: We do not find in briefs of counsel a claim that reversible error lurks in that particular ruling. But whether so or not, the witness thereafter testified fully in regard to that payment and the chancellor was fully advised.]

Continuing, he said he was sued by Johnson on February 21, 1905, "on the note." Thereafter he called on Johnson and was told by him that "he merely filed suit for his own protection." Thereupon, witness "simply filed a general denial." The suit was continued from time to time. In October, 1905, witness, then in New York, received a telegram "from the young man in his office." [*Note*: This telegram was from Mr. Cornelius, the attorney of witness in the case of Johnson v. Cantwell.] That telegram informed him, under date of October 6, that the Johnson case was set for the 16th. Thereupon the following telegrams were exchanged between Cantwell and Johnson:

Oct. 12, 1905.

J. B. Johnson, Third Floor Roe Building, St. Louis, Mo.

Will remit to-day commission of one Hundred and interest eight per cent to date and costs of suit if you will extend redemption contract ninety days and continue case meanwhile. Important that I remain here another week. Answer stating amount if satisfactory.

H. J. Cantwell.

St. Louis, Mo., 12th.

H. J. Cantwell, The Panama Co., 11 Bway., N. Y.

Accepted if taxes I paid in July for you, also attorney fee $100 with interest and court costs named will make total $651.96.

J. B. Johnson.

3:25 P. M., Oct. 12, 1905.

J. B. Johnson, 3rd Floor Roe Building, St. Louis.

That is more cash than I have, can send you three hundred fifty, and add balance to option. Is this satisfactory?

H. J. Cantwell.

St. Louis, Mo., 10-13.

H. J. Cantwell, The Panama Co., 11 Bway., N. Y.

No, I cannot do it.

J. B. Johnson.

Oct. 13, 1905, New York.

J. B. Johnson, 3rd Floor Roe Building, St. Louis.

Can send you check for three hundred and fifty to-day, and will have and pay remainder when I reach there Tuesday. Will this be satisfactory? Answer.

H. J. Cantwell.

St. Louis, Mo., 10-13.

H. J. Cantwell, The Panama Co., 11 Bway., N. Y.

Send four hundred dollars New York exchange and balance next Thursday. Answer yes or no.

J. B. Johnson.

New York, Oct. 14, '05.

J. B. Johnson, 3rd Floor Roe Building, St. Louis.

Yes.

H. J. Cantwell.

Subsequently, the following agreement, made and signed between Johnson and Cantwell, of date February 15, 1906, was read into the record (omitting signatures and a conventional beginning):

That whereas the said Cantwell, party of the first part, believes that by reason of certain agreements heretofore made between him and R. M. Scruggs, now deceased, he is entitled to redeem $50,000 of said R. M. Scruggs; and, whereas, whether or not he has such right is a legal question, and the result of a judicial determination thereof uncertain; and whereas the said party of the second part is desirous of purchasing said bonds if they can be legally redeemed; now, therefore, this agreement witnesseth:

That the party of the second part agrees to furnish the party of the first part the sum of $30,000 in legal tender for the purpose of tendering said sum to the executor of said Scruggs, and demanding the return of said bonds, and if said bonds are delivered by said executor of Scruggs, the party of the second part agrees to pay therefor the sum of $32,000 and amount of any attached matured coupons, on the unpaid accrued interest on said bonds.

In the event that the said executors of Scruggs shall refuse to deliver said bonds on said tender and demand, a suit shall be instituted against them and the said Johnson shall hold himself in readiness to pay and shall pay the said sum of $32,000 and accrued interest as aforesaid (in the event of a judicial determination in favor of the right to redeem) for said bonds.

The said Cantwell agrees to render his legal services in preparation of a brief for such a suit without expense, and the said Johnson agrees to employ Chester H. Krum or some other good lawyer to conduct the same at the said Johnson's expense.

It is understood and agreed that such demand shall be made within sixty days from this date.

It is further agreed that as a consideration for the agreement of Cantwell to sell said bonds to Johnson in the event of their redemption at the sum aforesaid, said Johnson shall continue from term to term not to exceed six months a suit now pending in circuit court, Room 9, of the city of St. Louis, Mo., entitled Johnson vs. Cantwell, until a judicial determination of the right of redemption of said bonds or until said executors shall consent to surrender said bonds, and that in the event said bonds can be redeemed, the surplus between the amount necessary to pay for said bonds and the sum of $32,000, or as much as may be necessary, shall be applied on account of the sum due Johnson for the controversy in said suit or under a certain agreement between Johnson and Cantwell for settlement of same, which agreement is continued with the option of said Cantwell to receive the 500 shares of Columbia Lead Co. stock and 3,000 Topozark bonds upon payment either out of said surplus aforesaid, or otherwise of said sum due Johnson as pending in court and contract and 8% interest from date of————

The introduction of that contract was opposed by defendant's counsel and it went in over their protest and exception.

Continuing, witness said he discussed the facts (relating to that contract) with Johnson at the time he entered into it and from time to time, had told him he was ready when Johnson was with the tender; that at one time Johnson said he didn't know whether witness had a cause of action against Scruggs or not, and gave him to understand that he, Johnson, had talked to Judge Krum about it. On the Saturday before Johnson v. Cantwell was set for trial, witness called on Johnson and told him he was ready for that tender "whenever he was ready to discuss the matter again," and told him the case against witness was set for the following Monday. Johnson then told witness he was satisfied he had no case against Scruggs. [*Note*: The Scruggs mentioned was R. M. Scruggs,

then dead, leaving a will, W. F. Carter, executor.]
The conversation was continued to this effect: Witness said whether he, Johnson, cared to go ahead
with the agreement or not, witness wanted that case
continued, he was not ready to make the payment but
hoped to be shortly, and asked Johnson to notify
Smith to continue it. [*Note*: Smith was Johnson's
attorney.] After more conversation, Johnson said
he would "write Smith." He made no statement
whether he would or would not continue the case other
than was implied in his answer he would "write
Smith." Witness left Johnson's office with the idea
the case would be continued as requested and as implied in the promise to "write Smith." On Monday
witness found a post card from Johnson, reading:

> Harry, I cannot consent to another continuance. You will
> just be drifting back into the old rut of procrastination and
> renewal.                                                    Johnson.

Witness had filed a general denial as an answer
on April 5, 1905, and did not "find out" a judgment
had gone against him until the day after it was rendered. In due time, he filed a motion to set the judgment aside. That motion was overruled.

At this point, witness was asked the value of the
collateral stock and bonds. On objection, an offer was
made to show they were then and now worth $8000.
The offer was refused and plaintiff saved the point
by an exception.

An attempt was then made to show a tender, after
judgment, on the 15th day of August, 1906, of $2750,
which tender included the amount bid at the sale of
the collaterals and which (it was offered to show)
was as much or more than was due on the whole matter. [*Note*: While it is not quite clear, yet we infer
the offer was made to sustain the allegation in the
petition of the tender and a demand for a return of the
stock and bonds.]

At this point it was admitted that executions issued on the judgment and levies were made on property in the city of St. Louis, and St. Francois, Franklin and Washington counties; and that all these properties were encumbered.

On plaintiff's offer to show the worth of his equities over and above the encumbrances, an objection was made and sustained—plaintiff excepting. An offer was then made to prove that the equities in those properties "if properly handled" exceeded $100,000. The court refused the offer. Plaintiff saved the point by an exception.

On cross-examination witness admitted that on the day of the trial he was called up by Smith, by telephone. Smith told him no judgment had yet been rendered. Witness told Smith that Johnson certainly did not insist on taking the judgment in violation of the agreement. Smith asked what agreement. Witness told him "it was contained in more than the telegrams." Witness also told Smith he could not leave the matter he was engaged in and hoped he, Smith, would see Johnson and insist on his carrying out the agreement to continue the case, adding that he was not prepared to go to trial, "since he had filed only a general denial." That afternoon witness received another telephone message from Smith asking him to come to court. Witness replied that if he took a judgment he would move to set it aside as in violation of the agreement. Witness did not go near the courthouse. He filed a motion for a new trial, accompanied by a copy of the agreement with Johnson, dated February 15, 1906 (the Scruggs redemption matter). He had paid Johnson "on the note" 1350 odd dollars, less the taxes. That amount included "bonuses and brokerages and everything else." It included the $200 for the original option, and the $651.96 referred to in Johnson's telegram of October 12, 1905, and $500 besides. Witness admitted he stated in his affidavit,

filed in aid of the motion for a new trial, that he had paid $850, explaining that as that affidavit was made thirteen months ago he did not have anything to refresh his memory at the time. At that time he had a recollection of having paid $1358, but was willing to let the $500 go as a bonus. Witness kept no accounts at the time. He recollected distinctly of paying Johnson the $500, and discussing with him the question of executing a note for the balance. [See last clause of original option.] Johnson said it would make no difference. Witness could not say whether the $500 was paid before or after he filed his answer.

At this stage of the trial and in this connection, defendant offered in evidence the petition, answer, motion to set the judgment aside, plaintiff's affidavits in support and the affidavits of Smith, Carter and Johnson *contra* and the counter or answering affidavit of Cantwell, the record overruling the motion for a new trial and the bill of exceptions signed by Judge Foster, June 1, 1906, filed the same day, in the case of Johnson v. Cantwell.

According to appellant's abstract there was no call for the foregoing documents in the bill of exceptions in the instant case—although, barring certain affidavits, they were read in evidence. Appellant summarizes them as a petition in ordinary form to recover $2559.61 with interest at eight per cent., from June 8, 1904, an answer in form a general denial, "and the motion for a new trial, and entry overruling the same are in the usual form." The court admitted all said proofs, except the affidavits of Smith, Carter and Johnson filed in opposition to the motion for a new trial.

Witness, continuing, stated he was represented on the motion for a new trial by Isenberg, an attorney; that there was no testimony from Cornelius in the bill of exceptions filed in that case; that he had endorsed the $200 on a certain paper as "paid for

option and repurchase at cost until January 15, 1905, the $200 to apply as part payment if option be exercised.'' No tender was made to executors of Scruggs, but it was not the fault of witness. He had talked to Johnson two or three times about it. He admitted Johnson said to him one time: ''Well, Harry, I do not know whether you have got a case there or not. I have my doubts about it.'' Johnson had seen the papers relating to this matter (the Scruggs matter) before he entered into the contract, or the exact contents were communicated to him. He then identified three several papers. Two dated June 5, 1903. One signed by himself, the other by Mr. Scruggs, and the third dated September 16, 1903, signed by Scruggs. Subsequently, those papers were introduced in evidence, reading:

St. Louis, Mo., June 3rd, 1903.

For and in consideration of the sum of twenty-eight thousand five hundred dollars ($28,500) to me in hand paid, the receipt of which is hereby acknowledged, I have this day sold to R. M. Scruggs bonds of the Catherine Lead Company numbered 164 to 213 inclusive and certificates numbered 5, 6, 7, 8, and 9 of the St. Louis Prospecting Company, aggregating five thousand shares of the capital stock of said company.

H. J. Cantwell.

St. Louis, Mo., June 3rd, 1903.

For and in consideration of the sum of one dollar to me in hand paid and the receipt of which is hereby acknowledged, I hereby grant to H. J. Cantwell the right to purchase, at any time before September 15th, 1903, unless this option be sooner terminated by notice in writing to that effect given at least five days before such termination, bonds of the Catherine Lead Company numbered 164 to 213 inclusive, with all coupons attached, said bonds aggregating fifty thousand dollars in amount, and certificates numbered 5, 6, 7, 8 and 9 of the St. Louis Prospecting Company for five thousand shares of the capital stock of said company, upon payment to me of the sum of thirty thousand dollars, at any time before September 15th, 1903, or the earlier termination of this option as above set forth.

It is understood that time is the essence of said agreement and the said option of purchase hereby given said H. J. Cant-

well shall expire on September 15th, 1903, or upon the giving of such notice to sooner terminate this option as above set forth.

R. M. Scruggs.

For and in consideration of the sum of one dollar, the receipt of which is hereby acknowledged, I hereby give and grant to H. J. Cantwell, of the city of St. Louis, Missouri, the right to purchase at any time prior to three o'clock in the afternoon of November 1st, 1903, the following described personal property, at and for the sum of $93,255.11:

50 $1,000.00 bonds of the Catherine Lead Company.

1,667 shares of the capital stock of the Catherine Lead Co.

10,000 shares of the capital stock of the St. Louis Prospecting Company.

It is expressly understood and agreed that time is the essence of this contract, and that upon the failure of said H. J. Cantwell to pay said sum of $93,255.11, on or before three (3) o'clock on the said 1st day of November, 1903, he shall forfeit all right under this option.

R. M. Scruggs.

Defendant, to sustain the issues on his part, took the stand. He admitted he got the $200 on the option to repurchase, and the $651.96 hereinbefore referred to, but denied receiving the $500. When the Scruggs agreement was made, he had seen no papers bearing on the transaction, but took Cantwell's statement as correct. Afterwards, he saw Carter, Scruggs' executor. Carter told him "he had been buncoed." Afterwards, he saw the papers (those hereinbefore copied, bearing date June 3, and September 16, 1903). Cantwell did not tell witness he had sold Mr. Scruggs the Catherine Lead Co. bonds and had made a bill of sale for them. Witness made the contract on Cantwell's statement that he had a right to redeem. Before taking judgment, witness had seen these papers and told Cantwell he had seen them and that he was satisfied, in fact knew, he had no case on the face of those papers and that he, witness, would have nothing further to do with the matter. Witness put his repudiation on the known character  of Mr. Scruggs for probity and the terms of the Scruggs-Cantwell papers, and ac-

centuated his opinion with heat and the expletive "damned." On the Saturday before the Tuesday on which he took judgment, he told Cantwell he would not grant a continuance. He admitted telling him he would write Smith, but said he also told him he would not continue the case. He wrote the post card offered in evidence the same day. On the day the case was set for trial witness and Cornelius appeared, the latter for a few minutes. Cantwell did not appear. The case was tried the next day and neither Cantwell nor Cornelius appeared.

On cross-examination, after reiterating that he told Cantwell he would not grant a continuance, but could not recall the words, he testified that Cantwell did not produce the contract between him and Scruggs. He interpreted it, said he had a case. When witness saw Carter he knew Cantwell had no case and that Cantwell had made representations as to the contents of the paper that were not true. Cantwell said he had pledged stock to Mr. Scruggs and had a right to redeem. Mr. Carter said he could not redeem. Witness paid Smith a fee as his lawyer to advise him in that matter. He had not given Cantwell credit for the $100 commission and the $100 attorney's fee remitted from New York because he had forfeited that; nor for the $200 original option because he had forfeited that; but did give him credit for $333.68 and sued him on "an account" and produced the note as evidence.

By Mr. Smith, Johnson's attorney in Johnson v. Cantwell, defendant showed that in October, 1905, on account of the telegrams between the parties, the case was continued. When set again for trial on April 23, he saw Cornelius, Cantwell's lawyer, at about 9 a. m. Conrelius came to witness's office and said there was an understanding between the parties that the case should be continued "and asked me if I was so instructed by Johnson." Witness told him his instructions were to try the case. They went together to

Johnson's office. There Johnson told Cornelius he was tired of continuances and had so written Cantwell. Afterwards, witness called Cantwell up by phone and asked him to come to the courthouse. He replied he was too busy and couldn't come. Witness asked him to send Cornelius over, which he agreed to do later. Witness told him, Cantwell, that he understood he "had no defense." Cantwell replied he had "as to certain credits and as to an agreement for a continuance." After this talk by phone, the case was laid over to the next morning and when it was called neither Cornelius nor Cantwell appeared. Whereat witness put Johnson on the stand and took judgment. Witness presumed he gave credit on the claim for $333.65 paid by Cantwell. [*Note*: This credit was what was left of the New York remittance after deducting cost, taxes, attorney's fee and commission.] Isenberg appeared for Cantwell on the motion for a new trial, Cornelius neither appearing nor giving testimony. Johnson consulted witness about the Scruggs business and witness saw the papers. When the motion for a new trial came up the legal effect of those contracts was gone over and witness advised Johnson that Cantwell had no equitable right of redemption.

By Mr. W. F. Carter defendant proved that several days before filing his affidavit in the case of Johnson v. Cantwell, he exhibited the contracts between Cantwell and Scruggs to Johnson. In the last contract securities are mentioned Cantwell never owned, viz., shares of stock in the Catherine Lead Company and in the St. Louis Prospecting Company. Witness testified also that when the Scruggs-Cantwell contract was made on July 3, 1903, Mr. Scruggs surrendered Cantwell's note to him and there was nothing showing an indebtedness on Cantwell's part. When Johnson called for the papers they were not in witness's

possession, but he got them and took them to Johnson's attorney, Smith, and showed them to him. When Johnson saw the papers, he told witness he had not seen them up to that time.

Cantwell, recalled, testified his note to Scruggs was not surrendered until after the four months mentioned in the two papers had expired. He was certain it was not surrendered on July 3, 1903.

Carter, recalled, testified there never was a fourmonths' option, that the option of July 3, 1903, expired September 15, 1903, and the option of September 16, 1903, embraced entirely different property and expired November 1, 1903. That no claim was ever made upon him as Scruggs' executor, nor was he ever advised of the pretense of a claim on the part of Cantwell, prior to the inquiry Johnson made of witness.

Such are the facts and rulings on which plaintiff predicates his claim of error in the decree.

Questions on such record naturally group themselves under these heads:

(a). Of the exclusion of evidence (and herein of the personnel of the parties litigant).

(b). Of fraud in tolling plaintiff into contractual relations with the bank and subsequent fraud in bringing about a foreclosure sale of his collaterals.

(c). Of usury.

(d). Of fraud in the procurement of the judgment in Johnson v. Cantwell (and herein of *res judicata*).

(e). Of the right to redeem the bonds and stocks independently of the right so set aside the judgment for fraud (and herein of the tender).

(f). Of excessive levies.

Considering those questions in their order, we make some observations and rule as follows:

I. (1) There is a tang in briefs springing an inference that plaintiff hopes (or expects) aid from

the fact that defendant is "by profession a money
lender." *Contra,* defendant lingers rather expectant-
ly and bitterly over the fact that "plaintiff is a law-
yer." We put away from us both those theories.
Peradventure, even a money lender, armed with the
wherewithal to take care of himself in the usual vicis-
situdes of business life (and with the love of money
strong upon him) may now and then need the aid of
equity. Peradventure, even a lawyer, with a specula-
tive turn, well equipped to take care of himself in the
usual vicissitudes of business life, may now and then
need the aid of equity and reach forth an appealing
hand to her—all this, though, for the *nonce* enamored
of riches, the ardor of his love for his old and jealous
mistress, the Law, under this record, cooled a trifle.
In equity lawyer and money loaner, borrower and
lender, meet upon a dead level. If the man of law
were the adviser of the man of money, a confidential
relationship would spring, somewhat burdening the
man of law; but as that factor is out of this case, as
they dealt at arms' length, and as neither the business
of the one, nor the profession of the other bears a whit
upon the merits, those epithets and appellations, mere
makeweights all, are beside the case, *ergo,*

"The man of independent mind,
He looks and laughs at a' that."

The record shows that neither litigant had any
advantage over the other in foresight and alertness,
and that both rose to rather a high water mark in that
behalf—both were able to take care of themselves and
hence, were not wards of chancery.

(2). The chancellor excluded evidence tending
to show plaintiff and defendant, during a long busi-
ness acquaintance, had many joint transactions in min-
ing enterprises, in which defendant carried plaintiff
for large sums and exacted usurious interest under
cloak of commissions and brokerages. That ruling
was right. Those gone-by transactions were not ger-

mane to the subject-matter of this suit. If sifted on both sides (as they should be, or not at all), they would have raised extraneous and collateral issues wide of the controversy. At the very worst, the evidence would have shown this plaintiff (speaking in permissible figure) to be a moth returning again and again to flit about the flame that scorched him. The testimony was too remote for value.

Plaintiff undertook to show that when he sought the bank for aid in paying Johnson off, the latter made an oral agreement with him to indorse the original and renewal notes at $50 per indorsement; that this arrangement was to continue until plaintiff was put in position to pay the same by realizing on his other collaterals, and that Johnson at a certain time refused to accept the $50 and declined to indorse again. It is not pretended that any memorandum was made of this contract and signed by Johnson. It is not clear it was to be performed within one year. *Contra*, as an arrangement in the nature of a going concern, it ran, on plaintiff's own theory, until Cantwell "realized on his other collaterals." When would that be? Certainly not within a year in the light of the terms of the contract, or in the light of the facts of this record.

The premises considered, it seems to us the contract would not support an action under the Statute of Frauds (R. S. 1909, sec. 2783). Hence the testimony was properly excluded.

But our ruling need not stand on that ground alone. There was no tender of proof that the bank was willing to accept Johnson's new indorsement, none that Cantwell had other collaterals on which to realize, or had made any reasonable attempt to fulfill his part of the agreement "by realizing on his other collaterals," and none that he made any attempt to avert his injury by securing another indorser at the bank, or tried to place his loan elsewhere, or help himself

betimes. If the proof had been admitted, it would have left the very right of the case precisely where its exclusion left it. Johnson did not relieve himself from any liability by refusing to indorse anew. He was then an indorser, and presently responds to that obligation. The uppermost question with him (at that time) was: When shall I respond to that obligation —now or at some indefinite time hereafter? He elected to respond at once. We think he had that legal right, absent a binding contract to the contrary, and present merely "a hopeful encouragement," resting in parol, and "sounding in prophesy." [Hall v. Bank, 173 Mass. 16.]

There was no error in the ruling.

There was an offer to show a conditional tender several months after the judgment in Johnson v. Cantwell; also one to show that Cantwell's equities, levied on under executions issued on the judgment in that case, were worth so much as $100,000 "if properly handled." Errors predicated of the chancellor's adverse rulings on those offers will naturally resolve themselves with the determination of main propositions further on.

II. The bill alleges a cunningly laid and fraudulent scheme on Johnson's part in getting plaintiff into the bank and thereafter fraudulently springing the trap of a foreclosure of his collaterals. But there is not a particle of proof to sustain those allegations. Plaintiff went into the bank because Johnson said he was "in need of money." We take judicial notice that the need of money is an abiding infirmity natural and common to all men. There is no fraud or element of fraud in such need, in and of itself, and a statement by A to B that *he needs money* but announces an elemental, goading and eternal fact. But, closer home, there was no offer to show that Johnson did not need money and that particular money, none to show that he contrived and thereafter harbored the roundabout

and unlikely scheme of parting with the collaterals he then held, in order to repossess himself of them later, and nothing worthy the name of testimony showing he brought about the foreclosure with sinister purposes, or at all. To the contrary, that foreclosure is due and traceable to the terms of plaintiff's own contract with the bank, and to his own voluntary subsequent default. He held the key to the situation and threw it away. Certainly, the mere fact that the foreclosure followed an interview between the bank's president and Johnson in no way wrongfully connects Johnson with it in the relation of cause and effect. Johnson was sent for to protect his indorsement. His contingent liability had then ripened through plaintiff's default, the protest and notice of protest of the note. It stands conceded the sale of the collaterals was attended by all the due formalities of the law. There was no haste, "snap judgment," secrecy, deception or singular features challenging attention. Advertisement was made. A month's time was given. The sale, we take it, was in open market, and Johnson bought, presently paying the residue of plaintiff's debt. Why not? He had the legal right to so buy and was under the legal duty to so pay. To torture the exercise of this legal right and the performance of this legal duty into evidence of fraud is to turn things topsy turvy and violate the clearest precepts of the law. For fraud is not to be presumed (although the chancellor may feel for it high and low, far and near, and search it out from small circumstances, yet), it does not rest in suspicion or conjecture. Men are presumed to act from correct and honest motives until the contrary appears. And where two hypotheses are open on the proof, one noble, the other not, a chancellor has warrant to take the noble view of it.

Again. There is no attempt to show the invalidity of that foreclosure. Indeed learned counsel for plaintiff assumes, for argument's sake, a valid sale

and that title passed thereby. So, the case runs on the theory the note was valid, the collateral contract of pledge was impregnable and that Cantwell made default.

III. Something is made of alleged usury.

In answer respondent denies the usury, but goes further and contends that if we hold the money paid on the options was usurious, as plaintiff claims, yet equity does not lend its aid to recover back usurious interest once paid nor grant relief against usury, especially where the borrower has omitted to plead it at law, and shows no proper excuse for such failure —all of which latter facts were present, he says, in the case of Johnson v. Cantwell, the suit on account of the liability of the recalcitrant principal to the paying indorser of the note.

On which contentions, we observe:

To consider usury is waste time. This, because of the frank admission of plaintiff in his reply brief, viz.: "Plaintiff seeks no relief on the ground that defendant took usurious interest, nor does he seek the recovery of such usurious interest, hence the entire argument of the defendant on that branch of the cases falls to the ground."

Be it so. And with that fall there also fell the allegation in the bill that by virtue of the statute in such cases made and provided the taking of usurious interest cut away the lien, if any, held by defendant on the collateral bonds and stocks.

With the case clarified by setting the foregoing questions at rest, we reach the main three propositions—one of them being:

IV. Should the judgment in Johnson v. Cantwell be annulled?

On the theory that a case well stated is half decided, we have set forth at length all the facts, among them those on which plaintiff relies to show fraud and

upon which he predicates his equitable right to be relieved of the judgment.

We rule he is not entitled to that relief and put our ruling upon several grounds, viz.: On failure in the proof to show fraud; on a decree against him below with conflicts in the testimony on material facts; on the maxim that equity assists ignorance but not carelessness (and herein of plaintiff's laches); and on the further ground that plaintiff had his day in court in the law case, and matter, vital here, was adjudged against him.

In appealing to equity to set aside a judgment rendered at law, the precepts are: Equity does not incline to introduce new and unusual things. It is not vague and uncertain in that behalf, but has determined boundaries and limits, although it desires the spoiled, the deceived and the ruined, above all things, to have restitution where the facts call for such relief.

In the affairs of men there is no place under the sun where fraud should be permitted to take sanctuary and claim immunity from pursuit, discovery and punishment. The solemn judgments of courts of justice of any degree afford it no sanctuary. But courts have a wise and natural aversion to overthrowing judgments. There must be an end to litigation in the interest of the State and for the repose of society; therefore when the help of a court of equity is asked to undo what has already been done and adjudged by a court, fraud in the cause of action itself, in false allegations or false testimony, will not suffice. Such fraud was within the issues on the merits. The complainant had his day in court and the question is foreclosed. So, where fraud, accident, surprise or mistake is the ground for equitable relief against a judgment, plaintiff must come into court with a cause unmixed with his own negligence or fault; for "no man is entitled to the aid of a court of equity, when that aid becomes necessary by his own fault." So,

fraud entitling him to relief must be fraud arising on extrinsic matter whereby he or the court was tricked, and the court was made an instrument of injustice. So, when he claims it to be against conscience to execute a judgment, the injured party must clearly prove either that he could not have availed himself of his defense in a court of law, or that he might have availed himself of it but was prevented by fraud or accident unmixed with his own fault or negligence. The fraud for which a judgment may be vacated or enjoined must be in its "procurement" in its "concoction," in the "very act" itself. Judgments are impeachable only for fraud "*extrinsic* to the merits of the case." "They are not impeachable for fraud relating to the merits between the parties." All such "mistakes and errors must be corrected from within by a motion for a new trial, or to reopen the judgment, or by appeal." The foregoing propositions announce settled doctrine. See, for one or the other of them, 2 Freeman on Judg. (4 Ed.), sec. 486; *Ibid.* sec. 489; Howard v. Scott, 225 Mo. l. c. 713, *et seq.,* and cases cited; Wingate v. Haywood, 40 N. H. 437 (Quoted from with approval in State ex rel. v. Engelmann, 86 Mo. l. c. 562, *et seq.*); Carolus v. Koch, 72 Mo. 645; Renfroe v. Renfroe, 54 Mo. App. 429; Smith v. Powell, 50 Ill. 21; Matson v. Field, 10 Mo. 100; Murphy v. DeFrance, 101 Mo. 151; Hollmann v. Conlon, 143 Mo. l. c. 384; Dorman v. Hall, 124 Mo. App. 5.

On the facts of this record, applying the principles announced, we think they preclude the annulment of the judgment. Plaintiff, through policy, indifference or whim, deserted his case at law. He knew in advance Johnson was pressing for trial, in a case long pending. If he had a defense, it is not made clear why the data for that defense were not accessible. But if not accessible, and if he had been lulled into fancied security by Johnson's options or attitude up to a time so close to the trial that he had grounds and

a right to a continuance, then he voluntarily threw away a continuance by not timely applying for it and putting himself, his cause and deserts unreservedly in the hands of the court to be dealt with in the exercise of a beneficent and wise discretion. Instead of doing that he trifled with the court and with himself. He chose to hug (and rest on) the delusion he could get the judgment set aside, thereby putting all his eggs into that one basket. He ought not to complain when by its fall they were broken. Not only so, but he timely moved to set the judgment aside. Unfortunate in that attempt he saved his exception and took steps to have this court review the alleged erroneous decision of that court. He has not brought here in his bill of exceptions in the instant case his motion for a new trial in the former case, although it was introduced in evidence. We may not know certainly the grounds of that motion, but we shall assume (as we have the right to do) that, forewarned by the present hostile and unaccommodating attitude of Johnson and the imminent danger of an existing judgment, he put his best foot foremost and presented to the court thereby his defenses on the merits and the reasons the trial should have been postponed till those defenses could be made effective by proper pleadings in a new trial on seasonable time to have his evidence forthcoming. When the circuit court refused to reopen the case, his adequate and plain remedy was by appeal or error. Such evidently was his own theory; for he filed a bill of exceptions and took the preliminary steps to come up. Why did he then again voluntarily throw away his remedy? Some light may be thrown on the rather whimsical attitude of Mr. Cantwell by his brief wherein he complains that Johnson again lulled him into security. How? By doing nothing and saying nothing, viz., by not suing out executions until the year had gone by for him to sue out a writ of error—an ingenious but fanciful conceit not commend-

ing itself to a forum of reason. It would take much whetting on such a scythe to mow an appreciable swath.

We find no error in the refusal of the chancellor to disturb the judgment in Johnson v. Cantwell. The right to set aside that judgment was *res judicata* when the court ruled adversely on his motion for a new trial and he slept on his right to appeal, or bring error. [Johnson v. Latta, 84 Mo. l. c. 142; Reilly v. Russell, 39 Mo. 152; Miller v. Bernecker, 46 Mo. 194; Murphy v. DeFrance, 101 Mo. 151.]

The merits became *res judicata* at the same time, for the doctrine of the thing adjudged, under the broad policies of the law, is that those issues which are germane and should or might naturally have been tendered are precluded by the judgment once for all. [Spratt v. Early, 199 Mo. l. c. 501; Donnell v. Wright, 147 Mo. l. c. 647, and cases cited.] Those points are precluded under the doctrine of the thing adjudged which belongs to the subject of the litigation, and which, by the exercise of reasonable diligence, might have been brought forward at the time. (Donnell v. Wright, supra.) *Res judicata,* in full bloom and vigor has drastic results—witness the maxim: *Res judicata facit ex albo nigrum; ex nigro album; ex curvo rectum; ex recto curvum.*

Plaintiff argues that *res judicata* is not formally pleaded. To that we say: Both sides plead the judgment, the testimony on that score went in without objection, and the case was tried below on the theory the matter had passed into the realm of a thing adjudged.

The point is not well taken.

V. It is argued that, in the event the judgment stands (as we have just ruled it must), yet under the facts and pleadings plaintiff is entitled to redeem the stocks and bonds.

The bill is quite evidently drawn on the theory the judgment stands in the way of such redemption, and must be got rid of before that particular relief can be got at. But waiving that view of it, and letting the point break on its merits, we rule it against plaintiff. This, because:

Some parts of the testimony faintly suggest a right to redeem, but the broad trend of it points to a conditional sale—an option to repurchase. The right to redeem presupposes a pledge or mortgage and an indebtedness for which the pledged property stands as security. It is by such inferences that plaintiff constructs the fabric of a pledge to secure indebtedness and create a right to redeem—the precepts to go by being: Once a mortgage, always a mortgage. Equity looks favorably on the right of redemption. Equity resolves mere doubts so as to further that right. But a careful consideration of the facts leads us to conclude there was no pledge, no mortgage, no indebtedness for which the stocks and bonds stood as a security as between Johnson and Cantwell, and, therefore, no right of redemption. *Contra,* as said, there was a conditional sale, an option to repurchase that was not exercised within the time limited by any of the options. The original pledge of the collaterals to Johnson had subserved its purpose and come to an end when the collaterals were surrendered to Cantwell by the payment of Johnson's original loan and repledged to the bank by him. To hark back to that old relation is but to amuse ourselves with an echo or reminiscence. When Johnson subsequently bought the collaterals at an admittedly regular foreclosure sale, he became the absolute owner of them. His bid money did not, by that act, become an indebtedness from Cantwell to him. When Johnson subsequently responded to his liability as indorser and paid the residue of Cantwell's debt to the bank, from thence forward that part of

the money so paid became an indebtedness arising by implication of law from the implied obligation of Cantwell as principal on the note to make Johnson whole as paying surety. To that extent there was an indebtedness, but the testimony does not show that the collaterals at any time were pledged to Johnson to secure such indebtedness. They were his already. True, he agreed with Cantwell afterwards that the latter might repurchase them at a certain time and a certain price, viz., the total amount Johnson was out of pocket. But that was a sale on condition in which Johnson was seller and Cantwell buyer. The weight of the evidence sustains that view of it and the chancellor did not err in so finding. [Donovan v. Boeck, 217 Mo. 70; Bailey v. Trust Co., 188 Mo. 486; Powell v. Crow, 204 Mo. 481; Duell v. Leslie, 207 Mo. 658.]

The burden was upon plaintiff to allege a mortgage or pledge between Johnson and him, and make out his case by a satisfactory preponderance of evidence. [Jones v. Hubbard, 193 Mo. 147.] That burden he did not well carry.

While the bill alleges a tender, yet it does not allege, nor was there proof to show, a tender in pursuance of the time, terms of a conditional sale and an option. Time is of the essence of an option contract and prompt performance by the holder of the option must be tendered. [Donovan v. Boeck, 217 Mo. l. c. 92, et seq., and authorities cited.] In that view of it the exclusion of evidence of the tender was well enough. Mark, also, the tender was a conditional one. It was not made for the purpose of paying the judgment debt and costs, but for that, and further, to recover the stocks and bonds. Johnson was not obliged to accept it on those terms—this regardless of the value of stocks and bonds. The valuation of mining stocks and bonds notoriously fluctuates and depends on speculative features and the state of the

market.  Whatever sentimental views be taken of Johnson's dealings with Cantwell, he is entitled to the law protecting a bona fide purchaser at a regular foreclosure sale, but in passing we must say that it is not a little singular that if these stocks and bonds were of the value Cantwell puts upon them, he could not have raised upon them, in the great money market of St. Louis, on a month's notice, sufficient to redeem them from the bank and to put the surplus in his pocket.  The Johnson-Cantwell contract anent the Scruggs redemption was before the court in the law case and again in the instant case.  There was evidence which warranted the chancellor in dealing with that contract as he did.  His decree should not be impeached or disturbed on that score.

VI.  Finally, it is argued that the injunction should have been made permanent against the levies of the executions on the ground they were excessive.

We think the weight of authority is aginst plaintiff on that proposition.  It is admitted the lands were all incumbered. The amount of incumbrances is not shown, but that feature is not a controlling one. There could be but one satisfaction of this judgment. The duty of a sheriff in selling land on execution under the hammer is to subdivide it and sell only enough to satisfy the debt.  [R. S. 1909, sec. 2206.] Moreover, an execution defendant may elect the part he wants sold first.  [Ibid. Sec. 2207.]  Equity will not anticipate that sheriffs will violate their duty and discretion in that behalf.  Not only so, but if that duty was violated and that discretion ⁻ abused there was left plaintiff, as execution debtor, his remedy by timely motion to set aside the sale and prevent an abuse of legal process.

That any mere levy upon land is not "excessive" seems the general doctrine.  [11 Am. & Eng. Ency. Law (2 Ed.), p. 652, notes and cases cited; Drake v.

Murphy, 42 Ind. 82; Donaldson v. Bank, 20 Pa. St. 245; Palmer v. Gardiner, 77 Ill. 143; Cook v. De La Graza, 13 Tex. 431.]

We rule the point against plaintiff. That ruling carries with it a disposition of the proposition that the court committed error in excluding testimony of Cantwell as to the value of the equities in the lands levied upon ''if properly handled.'' That ruling of the chancellor might stand on the further narrower ground that there was no offer to show that Cantwell was qualified to testify upon the value of these lands.

The premises all considered, the judgment is affirmed.

All concur, except *Valliant, J.,* who did not sit.

## PER CURIAM ON MOTION FOR REHEARING.

It is insisted in that motion that Thornton v. Irvin, 43 Mo. 153, is in point, is controlling and has been overlooked by counsel and court. Briefly the Thornton case breaks on the theory that a mortgagee buying at his own sale under a mortgage with power of sale in the mortgagee, holds subject to redemption by the mortgagor. That case, therefore, is not in point. Johnson was not a mortgagee under the circumstances present here. He might have been entitled to subrogation to the mortgagee's rights to the securities had he paid the debt prior to foreclosure and when so subrogated might have the right to foreclose. But that is not the case here. Johnson did not buy at his own sale. There is not a particle of testimony that he procured the sale to be made covinously or at all. The sale was made by the bank itself and in open market on full notice. Johnson bought thereat and he had the clear legal right to buy. Why foreclose twice, when the first was effectual?

We are cited to McDaniel v. Lee, 37 Mo. 204; Perry v. Craig, 3 Mo. 516; Greer v. Bank, 128 Mo. 559. None of those cases are in point. They but

decide the familiar proposition that a pledgee may not buy at his own sale and thereby cut off the right of redemption. We have no bone to pick with that doctrine, but it does not apply to the facts of the instant case. Johnson was not pledgee. As said, he did not buy at his own sale, but at the sale of the true pledgee. Nor need we consider or decide what the relative rights of Johnson and Cantwell would have been if Johnson prior to the sale had paid off Cantwell's note as indorser and thereby have become entitled to subrogation to the Bank's rights to the securities pledged by Cantwell for the loan. It is sufficient to say that Johnson did not do that.

On further consideration of the motion we rest content with our original opinion. The chancellor passed on the alleged contract relating to the Scruggs securities and on substantial evidence found the issues of fact against plaintiff as to the binding force of that option. Not only so, but the law court had the same contract before it in the motion for a new trial in the case of Johnson v. Cantwell. The motion for rehearing is overruled.